### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| JAMES W. SLATTON<br><br>        Plaintiff,<br><br>vs.<br><br>PTS DIRECT BENEFITS, LLC,<br>CHARLES A. FARRELL and<br>TOMMY MITCHELL BRUMLOW,<br><br>        Defendants | Civil Action Number: _____<br><br><br>Jury Trial Demanded |

## COMPLAINT

Comes Now, Plaintiff James W. Slatton ("**Slatton**") by and through his undersigned counsel, and shows this Honorable Court the following:

## PARTIES

1.      Slatton resides in Hillsborough County, Florida.

2.      Defendant PTS Direct Benefits, LLC ("PTS") is a Georgia Limited Liability Company with its principal place of business located at 113 North Park Ave, Calhoun, Gordon County, Georgia 30701.

3.      Defendant PTS if it does not waive/acknowledge service, may be served by serving its registered agent, to wit: Charles W. Smitherman at 113 North Park Ave., Calhoun, Gordon County, Ga. 30701.

4.      Defendant Charles A. Farrell a/k/a Tony Farrell ("Farrell) resides in Gordon County, Georgia and may be served with service of process by serving him at 405 Cumberland Drive NE, Calhoun, Ga. 30701.

5.      Defendant Tommy Mitchell Brumlow resides in Gordon County, Georgia and may be served with service of process by serving him at 734 S. River Street Ext, Calhoun, Ga. 30701.

6.      The United States District Court has jurisdiction over this action as the amount in controversy exceeds $75,000.00 and plaintiff is of different citizenship from all defendants.  28 U.S.C. Section 1332.

## BACKGROUND INFORMATION

7.      Buddy's Home Furnishings ("Buddy's") is a rent-to-own home furnishings store that began in 1961 and had grown to 58 corporate-owned stores by 2008.

8.      In 2007, Buddy's began franchising and was the fastest growing franchise system in the rental-purchase industry growing to 110 stores in 2011 and to over 300 stores by 2015.

9.      Slatton was CEO of Buddy's from 2002-2015 and Gazzo was President of Buddy's from 2002-2015.

10.     The Association of Progressive Rental Organizations ("APRO") is America's only national trade association for the rental-purchase industry and is the governing body that oversees an industry with more than 4,000 stores.

11.     Both Slatton and Gazzo were Board Members of APRO during 2002-2015, while acting as CEO and President of Buddy's respectively.

12.     APRO holds an annual convention for its 4,000+ members each year.

13.     Benefit Marketing Solutions ("BMS") that, until 2011, was the only company selling plans to the rental-purchase industry through a warranty club program, designed to protect the stores' property while it was being rented by consumers and to provide stores with other protections.

**FORMATION OF PTS**

14.     Farrell began his relationship with Slatton, Gazzo, and the rest of Buddy's management team in 2010, when Farrell was working as a tax refund vendor that sold to the rental-purchase industry.

15.     In February of 2011, the upper management team at Buddy's, including Slatton and Gazzo, began working on a warranty club program of their own to

compete with BMS, and planned to begin marketing this new product to other rental-purchase stores at the APRO convention in July of 2011.

16.     On or about April 27, 2011, Buddy's Director of Franchise Sales informed Gazzo that he was meeting with Farrell at the Derrick Brooks Golf Tournament, a charitable golf tournament in Tampa, Florida.

17.     At that time, Farrell owned and operated a tax preparation service company located in Georgia, which offered services to the rent to own industry and was minimally used by the Buddy's entities.

18.     On or about May 1, 2011, Gazzo, Slatton, and Farrell all met in Tampa at the Hard Rock Hotel and Casino for the pre-party of the Derrick Brooks Golf Tournament.

19.     At that time, Farrell informed Gazzo and Slatton that he wanted to start a new warranty club program to compete with BMS.  Gazzo and Slatton shared with Farrell that they were in the middle of developing one.

20.     Farrell proposed they should all partner together to form a new company, and that Farrell would act as manager and lead the company.

21.     Gazzo, Slatton, and Farrell all shook hands and agreed to work together and form the company, PTS Direct Benefits, LLC, with Brumlow also joining as a member.  The four men agreed to divide the ownership interests as follows: 33.333%

to Farrell, 33.333% to Brumlow, and 33.333% to Gazzo and Slatton, split between them, 16.667% each.

22.     The ownership and management structure were set up in this manner because Gazzo and Slatton were managing directors of Buddy's at the time, and in the eyes of the other rental-purchase stores to which PTS would be marketing their products, they were part of the competition.  Therefore, if Gazzo and Slatton were controlling members or managers of PTS, it would be difficult to sell to other rental purchase stores.

23.     Farrell repeatedly stressed the need for "privacy" with regards to PTS ownership and management structure in conversations with Gazzo, the other PTS owners, and their attorneys.  A true and correct copy of an email forwarded from Farrell to Gazzo stressing the need for privacy, which also mentions the "Buddy's Investors" in relation to the PTS Operating Agreement ("OA"), is attached hereto as Exhibit "A."

24.     Farrell's attorney submitted the articles of organization of PTS and said articles were certified by the State of Georgia.   See Exhibit "B" – the Certificate of Organization dated May 24, 2011.

25.     Farrell, Gazzo and Slatton agreed to launch their new company, PTS, at the upcoming APRO annual convention to be held in Little Rock, Arkansas, in July of 2011.

26.     At that time, Buddy's was paying BMS approximately $70,000.00 per month for  services, over $800,000.00 annually. PTS's business was formed to tap into the BMS income stream and to use Gazzo and Slatton to divert Buddy's business with BMS to PTS, which would provide monies to PTS.

27.     In fact, Farrell requested and received Buddy's store information and contracts with BMS in order to be able to underbid BMS in the marketplace as well as to look for ways to get Buddy's stores out of their BMS contracts.

28.     A new startup company like PTS would never have been able to secure an account like Buddy's without the direct involvement and assistance of Gazzo and Slatton.

29.     In June of 2011, Farrell and Gazzo began discussing how PTS's contracts with Buddy's stores would be structured, the exact details of the Operating Agreement for PTS, and how Buddy's would terminate its existing relationship with BMS.

30.    On June 16, 2011, Farrell sent Gazzo a copy of the PTS Operating Agreement ("OA") and asked him to review it. The OA was prepared by Farrell's attorney.

31.    Gazzo and Slatton also met with their own attorney to review the PTS Operating Agreement.

32.    Susan Matthews, the President of BMS, and Danny Wright, the Chairman and CEO for BMS, sent Gazzo an email on June 16, 2011, urging Joe not to terminate Buddy's relationship with BMS, citing BMS's long history of involvement with APRO and the rental-purchase industry, and identifying all of the potential risks with switching to an "inexperienced" start up like PTS. A true and correct copy of those messages from Susan Matthews and Danny Wright, other messages from that conversation, and the BMS contract which was discussed are attached as Exhibit "C."

33.    On June 20, 2011, Gazzo sent a cancellation notice to BMS informing them that Buddy's was terminating their business relationship, using a clause in their contract that was discovered by Farrell's review of the contract provided to him by Gazzo and Slatton.

34.    On June 23, 2011, Gazzo sent an email to Farrell regarding a phone call that he had with Susan Matthews that day, stating that she and BMS wanted Buddy's

to wait until after the APRO convention to make the switch to PTS, knowing that announcing the switch prior to the APRO convention would clearly influence others in the rental purchase industry. *See* Exh. C.

35.   On June 28, 2011, however, Gazzo and Slatton signed new PTS Benefits contracts for their corporate stores and, consistent with the plan formed with Farrell, Gazzo and Slatton, required all one hundred and ten (110) of the Buddy's franchised stores to switch from BMS to PTS for warranty club services.  This provided  PTS with the necessary capital to begin operations.

36.   On July 10, 2011, Slatton and Gazzo signed the PTS Operating Agreement and Gazzo mailed the original to Farrell, thus confirming their relationship to and ownership in PTS.

37.   On July 11, 2011, Gazzo called Farrell to inform him that he and Slatton had executed the  PTS' OA and had mailed same to Farrell. Farrell then stated that he and Brumlow would execute the OA and keep it in a safe at Farrell's office in North Georgia. A true and correct copy of the PTS Operating Agreement, executed by Gazzo and Slatton, is attached hereto as Exhibit "D."

38.   Unbeknownst to Gazzo and Slatton, and upon information and belief, Brumlow and Farrell executed a different operating agreement that left out Slatton and Gazzo.

## THE CONTINUOUS BUSINESS RELATIONSHIP
## BETWEEN GAZZO AND PTS AS A MEMBER OF THE LLC

39.    On July 13, 2011, the APRO annual convention was held in Little Rock, Arkansas, and consistent with the plan developed by Farrell, Gazzo and Slatton, Buddy's  publicly announced that they had switched their store's warranty club programs to a brand-new company, PTS Direct Benefits, LLC.

40.    The announcement made by Gazzo and Slatton at APRO was a huge boost to PTS. Over the next few months more and more companies in the rental-purchase industry switched from BMS to PTS.

41.    In August of 2011, Gazzo, Farrell, Slatton and Brumlow began discussing the success of their business as sales progressed and other companies began to switch over their business from BMS to PTS.

42.    On January 17, 2012, Farrell sent an email to PTS's Chief Financial Officer, Jonathon Moss IV, copying the other PTS owners--Gazzo, Slatton, and Brumlow-- stating that, due to PTS's cash-flow success because of Gazzo and Slatton's efforts, starting on February 1, 2012, PTS would begin making monthly distributions totaling $30,000 to all of the owners. $5,000.00 would go to Slatton, $5,000.00 to Gazzo, $10,000.00 to Brumlow and $10,000.00 to Farrell. A true and correct copy of that email is attached hereto as Exhibit "E."

43.    The distributions Farrell set forth in his Jan 17, 2012 email corresponded with the ownership percentages in the PTS Operating Agreement. *See* Exh. D at p. 30.

44.    Upon information and belief, Slatton, Gazzo, Farrell and Brumlow received the monthly ownership distributions as described on page 30 of the OA for the next thirteen (13) months.

45.    In March of 2013, due to PTS's success, upon information and belief, the monthly distributions increased and, once again, were paid out in the exact same ownership percentages set forth in the PTS Operating Agreement-- $15,000.00 each to Farrell and Brumlow, respectively and $7,500.00 each to Slatton and Gazzo, respectively.[1]

46.    In October of 2015, Gazzo and Slatton sold their ownership interest in the Buddy's corporate entity and became  franchisees of forty-two (42) Buddy's stores they co-owned.

46.    Slatton and Gazzo stepped down as CEO and President of Buddy's in October 2015.

---

[1] The monthly distribution monies for Slatton, with Farrell and Slatton's knowledge and consent, was electronically forwarded to 4M Benefit LLC

47.     Gazzo continued to be involved in conversations with Farrell about management decisions and  profitability of the business related to PTS well into 2017.  During discussions with Slatton and Gazzo, Farrell regularly made statements that "we started this seven (7) years ago."

47.     Farrell also described distributions as management fees/administration fees.

48.     A copy of text messages from a group chat between Slatton, Farrell, and Gazzo, in which Farrell  confirmed the monthly "management fee/admin fee" would be sent to Gazzo and Slatton in January, February, March, April, May, June, August, and September of 2017, and including discussions of PTS competing with BMS into 2018 is attached hereto as Exhibit "F."

49.     Slatton continued to receive ownership distributions from PTS through September, 2017.

50.     In 2017, the Attorney General ("AG") for the State of Washington, Bob Ferguson, opened an investigation into the warranty club program offered by PTS. Farrell subsequently informed Gazzo and Slatton that he was worried about pending litigation with the Washington AG and he planned to stop monthly distributions to the owners to conserve PTS's cash flow so that it could defend against the potential lawsuit from the Washington AG and other AG's who might follow suit.

51.    Gazzo and Slatton understood the reasoning behind this decision by Farrell, thought it made good financial sense, and had no reason to question Farrell's decision.

52.    Gazzo and Slatton continued to promote and sell the PTS program to other rental-purchase stores and provided testimonials to potential customers of PTS.

53.    In January of 2018, BMS bid again for Buddy's business with lower pricing and a cash rebate program.

54.    In texts between Farrell, Gazzo and Slatton, Farrell compares and contrasts the new BMS plan with the PTS plan to demonstrate PTS is better and to have Gazzo and Slatton use their influence with the Buddy's stores to remain with PTS.  In this same text conversation, Farrell confirms Gazzo and Slatton's ownership by stating that "We started this almost 7 year (sic) ago!  We have never had 1 dealer leave us and go back to BMS!"  A true and correct copy of the January 20, 2018, text chain is included on page 46 of Exhibit "G."

55.    Gazzo, Slatton, and Farrell continued to have a close working relationship with PTS as well as a close personal relationship. In early March of 2019, they all went on a fishing trip to Guatemala together. During the course of planning and attending the trip, Farrell made no mention of any issues with PTS, its Operating Agreement, or ownership percentages. In fact, in the group messages

between the parties involving their Guatemala trip, the only discussion related to the fun they would have and had together.

56.   As outlined above, based on their close personal and business relationship, Slatton had no reason not to trust Farrell, and took him at his word when Farrell made representations about PTS, its formation, Slatton being a part of it, and its day-to-day business operations, including Slatton's ownership.

57.   In September 2019, the Washington Attorney General concluded his investigation and ended up dropping its claims against PTS.

58.   Farrell did not resume the monthly distributions as he indicated to Farrell and/or Gazzo that PTS incurred substantial expenses as PTS was required to obtain re-insurance coverage.

59.   In approximately August of 2022, PTS was sold to its long-time and only competitor, BMS, for an unknown sum, estimated to be between twenty to thirty million dollars ($20,000,000.00 to $30,000,000.00).

60.   When Slatton found out PTS was sold to BMS,  Slatton inquired on August 22, 2022 about his distribution share of PTS.  See Exhibit "H."

60.   On August 24, 2022, Farrell then informed Slatton, for the first time, the PTS Operating Agreement signed by Slatton and Gazzo was never actually

executed by Farrell and Brumlow, and Slatton did not have any equity in PTS.  See Exhibit "I."

62.    PTS generated several millions of dollars in revenue from Buddy's stores alone from July 2011 through PTS sale to BMS in 2022, revenue which was a direct result of Slatton's influence with Buddy's. That figure does not include other stores who switched to PTS due to Slatton's testimonials of the benefits of PTS over BMS.

## COUNT I – BREACH OF OPERATING AGREEMENT

63.    Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 62.

64.    Slatton for all relevant times herein was a member of PTS.

65.    Defendants are estopped from denying the existence and enforceability of the OA.

66.    Slatton performed his functions as a member of PTS by promoting PTS, by procuring hundreds of Buddy's stores to switch from BMS to PTS, publicly announce Buddy's and PTS's partnership; promoted, advocated for, and broughtg in business to PTS.

68.     PTS provided distributions to Slatton for a number of years in accordance with the operating agreement.

69.     In accordance with the operating agreement, PTS through its managing agent (Farrell) could not without consent of all members merge, consolidate with another company or sell all or substantially all of the assets of the Company as part of a single transaction or plan.

70.     Slatton has been deprived of the benefits of the OA and seeks his ownership interest, including, but not limited to the fair market value of his interest from PTS from the defendants.[2]

## COUNT II – BREACH of LLC AGREEMENT

71.     Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 70.

72.     Slatton for all relevant times herein was a member of PTS.

73.     If the written operating agreement is not enforceable, then in accordance with Georgia law, Slatton, Gazzo, Farrell and Brumlow are considered members of PTS and to have equal economic interests and equal voting interests.

---

[2] If need be, Slatton dissents from the decision to sell PTS to BMS and in accordance with Georgia law, the fair market value of his interests should be paid.

74.     As a result of the unauthorized sale of PTS, Slatton seeks the fair market value of his interest from the defendants.

## COUNT III – UNJUST ENRICHMENT

75.     Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 74.

76.     Slatton conferred an enormous benefit and rendered numerous services on behalf the defendants: he provided PTS with their first major account in signing all of the Buddy's stores up for PTS's Warranty Club services; the funds provided by Buddy's provided the seed capital to get PTS off the ground; the announcement made by Buddy's management at the annual APRO convention in 2011 about their switch to PTS generated a majority of PTS's initial business; Slatton promoted PTS and provided testimonials to potential PTS customers outside of Buddy's, and through all of Slatton's efforts, helped grow PTS to the point that its biggest competitor bought PTS out for millions of dollars. Slatton equitably ought to be compensated for these numerous benefits.

77.     PTS had knowledge of the benefit conferred by Slatton and received the same all the while promoted and reinforced Slatton's belief that he was a member of PTS.

78.    PTS accepted and received the benefit conferred by Slatton, as evidenced by multiple emails, texts, and calls from Farrell and the other owners of PTS discussing business decisions together over the course of eight years; and monthly distributions made by PTS to all of the owners in accordance with their respective ownership interests for five years.

79.    It would be inequitable for PTS to retain the above-described benefits without paying Slatton the fair value of the benefits received by PTS from him.

80.    Defendants owe Slatton the fair market value of his services as will be determined by the trier of fact.

## **COUNT IV – FRAUD**

81.    Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 80.

82.    Assuming Slatton was not a member of the LLC, defendants, separately or in concert, intentionally misled Slatton about his role in the LLC.

83.    Farrell and Brumlow fraudulently concealed the fact that the Operating Agreement was never signed that had Gazzo and Slatton as members, fraudently concealed the fact that a different operating agreement was signed without Gazzo and Slatton as members, and they fraudulently concealed the sale of PTS to BMS.

84.     Defendants never provided Slatton his distributions after September 2017 and never provided Slatton his distribution from the sale of PTS to BMS.

85.     Defendants induced Slatton to act and misled him in his belief about ownership in PTS, while they alone knew that they had not executed the PTS Operating Agreement, they happily accepted the start-up funds provided by Buddy's at Slatton's direction, benefitted from Slatton's promotion of PTS at APRO, knew Slatton would end Buddy's relationship with BMS nation-wide in order to switch over to PTS, and knew Slatton would continue to market for PTS and bring in additional business.

86.     Slatton justifiably relied on the false representations made by Farrell. The parties had developed a very close business relationship as well as personal friendship, which Farrell exploited for his benefit.

87.     Farrell assured Slatton the Operating Agreement was executed and in held in his safekeeping. They frequently communicated, Farrell would consult with Slatton on major business decisions regarding PTS, Farrell always referred to Slatton as an owner, a manager, or a shareholder when discussing PTS, and Slatton received monthly distributions of profit from PTS that continued from January of 2012 through September of 2017, and when those distributions stopped, Farrell provided a reasonable explanations to Slatton

88.     Slatton's damages as a result of his reliance on Respondents' misrepresentations are apparent, as he is owed monies in unpaid ownership distributions from October 2017 through the date of PTS sale in 2022 and he is due his portion of the net proceeds of PTS' sale to BMS in an amount as determined by the trier of fact.

## COUNT V – BREACH OF FIDUCIARY DUTY

89.     Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 88.

90.     Farrell and Slatton as the majority owners with controlling interests in PTS owed a fiduciary duty to Slatton.  A fiduciary duty exists "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58. Brumlow and Farrell were presumed to be legitimate business partners to Slatton, and Farrell and Brumlow, as majority shareholders and managers of PTS, were situated to exercise a controlling influence over the other members of PTS.

91.     Farrell and Brumlow breached that duty to Slatton through their acts of fraud and concealment, by never executing the PTS Operating Agreement with

Gazzo and Farrell as members, executing a different OA and making false representations to Slatton about his membership interest for over 8 years.

92.     As explained above, Slatton has suffered significant damages proximately and directly caused by defendants'breaches of their fiduciary duty to him.

93.     Defendants owe Slatton damages, as mentioned in preceding paragraphs, as will be determined by the trier of fact.

## COUNT VI – DEFALCATION

94.     Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 93.

95. Defendants misappropriated funds and are liable independently or in concert with each other and owe Slatton for the misappropriated funds.

## COUNT VII - ACCOUNTING

96.     Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 95.

97.     Slatton demands an equitable accounting of PTS financial records to determine the value of monies owed to him in the form of distributions which were never paid from October 2017 to the present, what amounts, if any, were paid to

other members, the sale price of PTS to BMS, and what amounts, if any, were distributed to the other members as a result of the sale.

## COUNT VIII – ATTORNEY FEES

98.    Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 97.

99.    As a result of defendants' bad faith, being stubbornly litigious and/or causing unnecessary expense to Slatton, Slatton seeks his attorney fees pursuant to O.C.G.A. Section 13-6-11.

## COUNT  IX – PUNITIVE DAMAGES

100.   Slatton incorporates by reference as if fully set forth herein paragraphs number 1 - 99.

101.   As a result of defendants' willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, defendants (separately or in concert) are responsible to pay punitive damages in an amount to be determined b y the trier of fact.

**WHEREFORE**, JAMES W. SLATTON, prays for judgment in an amount to be proven at trial against the defendants together with interest, court costs, attorney

fees, compensatory damages, punitive damages  and any such other and further relief

as the Court deems just and proper.

Respectfully
*Kenneth Behrman*
Kenneth Behrman
Attorney for Plaintiff
Georgia Bar Number 046995

5855 Sandy Springs Circle
Suite 300
Atlanta, Georgia 30328
770-952-7770 (phone)
770-952-6775 (fax)
ken.behrman@behrmanlaw.com